Filed 6/11/24  P. v. Montana CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JONATHAN MONTANA,<br><br>    Defendant and Appellant. | H049456<br>(Santa Clara County<br>Super. Ct. No. C1774437) |

T. Doe[1] had six shots of alcohol with her friends before they went to a nightclub where she encountered defendant Jonathan Montana.  After introducing himself, Montana bought T. Doe two additional shots of alcohol, and a short time later, Montana walked the (now-intoxicated) T. Doe to a nearby hotel where he had vaginal, anal, and oral sex with her as she faded in and out of consciousness.  After a jury convicted Montana of multiple sex offenses, the trial court sentenced him to a total term of three years in prison.

On appeal, Montana raises two arguments related to his retained counsel: (1) the trial court abused its discretion by denying his post-trial, pre-sentencing request to discharge counsel; and (2) his retained counsel rendered ineffective assistance due to a

---

[1] At trial, the victim's first name was used in conjunction with her "Doe" designation.  However, we will use only her first initial along with "Doe" to protect her privacy interests.  (Cal. Rules of Court, rule 8.90(b)(4).)  For the same reason, we will refer to the various witnesses by their initials.  (Cal. Rules of Court, rule 8.90(b)(10).)

conflict of interest. Montana also argues the trial court committed evidentiary error by excluding lay opinion testimony regarding the victim's ability to consent.

As we explain below, we conclude that none of Montana's arguments have merit and we will affirm the judgment.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural background

On January 6, 2020, the Santa Clara County District Attorney filed a first amended information charging Montana with the following felonies: sodomy by use of an intoxicating, anesthetic, or controlled substance (Pen. Code, § 286, subd. (i); count 1);[2] sodomy by force (§ 286, subd. (c)(2)(A); count 2); oral copulation by use of an intoxicating, anesthetic, or controlled substance (§ 288a, subd. (i); count 3); oral copulation by force (§ 288a, subd. (c)(2); count 4); rape by use of an intoxicating, anesthetic, or controlled substance (§ 261, subd. (a)(3); count 5); rape of a victim unconscious of the nature of the act (§ 261, subd. (a)(4); count 6); and rape by force (§ 261, subd. (a)(2); count 7).

A jury found Montana not guilty on count 6 (rape of a victim unconscious of the nature of act) but convicted him on all of the remaining counts. The trial court sentenced Montana to the lesser term of three years on count 2 (forcible sodomy), with concurrent separate three year terms on count 4 (forcible oral copulation) and count 7 (forcible rape). The court also imposed, but stayed pursuant to section 654, separate three year terms on count 1 (sodomy of an intoxicated person), count 3 (oral copulation of an intoxicated person), and count 5 (rape of an intoxicated person). The court directed that Montana register as a sex offender (§ 290).

---

[2] Unspecified statutory references are to the Penal Code.

The trial court ordered Montana to pay a restitution fund fine of $500 (§ 1202.4, subd. (b)), a sexual offender registration fine of $300 (§ 290.3), a court operation assessment of $240 (§ 1465.8), a court facility assessment of $180 (Gov. Code, § 70373), and a criminal justice fee of $129.75 payable to the County of Santa Clara (Gov. Code, §§ 29550, 29550.1, 29550.2.) All fines and fees were stayed pending a showing by the prosecution that Montana had the ability to pay.

Montana timely appealed.

## B. Factual background

### 1. The prosecution case

#### a. Events prior to the sexual assault

T. Doe testified that she met up with some friends at a hotel in downtown San Jose on the evening of January 20, 2017,[3] to celebrate a birthday. Before going to the hotel, Doe drank two shots of tequila at a friend's house. After arriving at the hotel between 10:30 p.m. and 11:00 p.m., she socialized with her friends and drank four shots of "[Jägermeister]."

Around 11:30 p.m., Doe and her friends left the hotel and walked to a nightclub.[4] Doe began to feel the effects of the alcohol on the way to the club, but it did not affect her ability to walk. When they arrived, Doe was worried she would not be allowed in if she appeared intoxicated, but she was admitted.

In text messages with a friend earlier in the evening, Doe expressed some concern about going out that night because she had not consumed alcohol for some time prior and this was her first time going to a nightclub. Although Doe and her friends did not discuss "keeping an eye on each other[,]" Doe assumed her friends would look out for her.

---

[3] Unless otherwise specified, all dates are from 2017.

[4] In 2017, Doe had been living with her then-boyfriend for around two years, but her boyfriend did not accompany her that evening.

3

One of Doe's friends, A.K., wanted to celebrate Doe's first time in a nightclub by drinking a shot at the bar. As Doe made her way to the bar, one of the patrons, who Doe later learned was Montana, lifted his arm as she went past him, which made her duck and move around him. Doe thought it was weird, as Montana "put his arm out directly in front of me." When Doe got to the bar, she drank a shot of tequila with A.K. Doe could feel the effects of the alcohol but could still walk and carry on a conversation.

At the bar, Doe made eye contact with Montana. Montana smiled and introduced himself. During their conversation, Montana told Doe she was "really pretty" and "had a good aura about [her]." At some point, after A.K. told Doe that Montana "seems old," Doe asked Montana his age. Montana, who was 36 years old, lied to Doe and said he was 30 years old.

Doe was flattered by Montana's compliments and thought he seemed genuine and friendly. Montana bought tequila shots for himself, Doe, and A.K. After they drank their shots, Doe, Montana, and A.K. left the bar and danced. On the dance floor, Doe felt "the alcohol [] hitting" and "wasn't really thinking much, just doing." She recalls that she and Montana were facing each other "dancing close[]" with their "bodies [] touching."

A.K., Doe, and Montana returned to the bar with several other of Doe's friends. Montana bought another round of shots for everyone. The shots were larger than those in the first round Montana ordered. Doe was initially unable to finish her shot, so she tried to give it to one of her friends, but he declined. Doe asked Montana to finish it, but he told her it was hers, so she finished it herself. While at the bar, one of Doe's friends, L.A., told her that if she felt she needed help, she should let him or one of her other friends know.

Montana asked if he could stay in touch with Doe so she handed him her phone to enter his number. Doe then sent a brief text message, "Hey, it's [Doe]," to that number.

4

After the second round of shots, Doe wanted to dance again, but wanted her friends to join her.  A.K. pushed her toward Montana so Doe and Montana returned to the dance floor.  "[T]hings were starting to get really hazy and … [she] wasn't sober" so Doe felt nervous.

Doe and Montana again danced face to face.  Doe "remember[ed] there was kissing … [and she] turned around and [] grinded on him."  Montana said that she "smelled good" and kissed her on the neck.  Doe was not thinking about her boyfriend and did not feel bad about kissing Montana as "there[] [was] an attraction" between them.

As they danced, Doe had to hold her knees and Montana's legs to keep her balance.  Doe felt the room begin to spin and her vision got blurry.  She felt nauseated, stopped dancing, and told Montana she needed to sit down.  Montana followed her to a couch.  He asked if she was okay and Doe said that she needed to find her friends as she did not know where they were.  Montana leaned over and tried to kiss her again, putting his tongue in her mouth, but she did not want to kiss him.

A.B. was at the nightclub with Doe and their other friends that night.  A.B. did not drink anything that night, either at the hotel or at the nightclub.  A short time after she arrived at the nightclub, A.B. started "doing rounds to check up on" her friends because she was sober and felt it was her responsibility to look out for them.  A.B. saw Doe and some of her other friends at the bar, where Montana was buying shots for the group.

After dancing and talking to some other friends who happened to be at the nightclub, A.B. did "another set of rounds" and saw Doe standing in a corner by the bar with Montana holding her up.  Doe was "definitely drunk" with her head down.  A.B. made eye contact with Doe, gave her a double thumbs-up and, due to volume of music in the nightclub, mouthed at her asking if she was okay.  A.B. was too far away to hear any verbal response, but saw Doe do "something with her hand."  A.B. was not sure if Doe's

5

gesture meant she was okay or if she wanted A.B. to go over to her. Doe then mouthed something, which A.B. thought was " 'Never mind.' " A.B. did not follow up with Doe.

When A.B. and a number of her friends left the nightclub around 1:15 a.m., she noticed that Doe was not with them. A.B. went back inside but could not find Doe. A.B. and the others started calling Doe's phone as they walked back to the hotel where they continued to try to reach Doe.

After sitting on the couch with Montana, Doe next remembered being outside the nightclub but she had no memory of how she got there.[5] She could not walk very well and was not aware if there were other people around her, other than Montana, who was holding her up with his arm around her shoulders. Montana was telling Doe to "look sober" and saying "We're almost there."

Doe's next memory was of being inside a "really bright" hotel lobby. She later learned that they were at the Fairmont Hotel, but she did not remember Montana checking in. Montana again told Doe to look sober and they walked over to the elevators.

Doe remembered being in a hallway inside the hotel and holding on to Montana for support. Montana opened the door to a room with a key card and they went inside. Doe recalled walking toward the bed but then "everything [went] blank."

### b. The sexual assault

Doe next remembered lying on her back, naked, on the hotel room bed. Montana's penis was in her vagina and she recalls him asking her if she "liked his dick." Doe was scared and did not respond. She did not know where she was and felt paralyzed and drunk. Doe blacked out again.

When Doe next awakened, Montana was still having sex with her but this time, Doe noticed that her phone was vibrating. Montana asked Doe if he could have anal sex

---

[5] The jury viewed video surveillance footage which showed Montana leading Doe out of the nightclub to the sidewalk.

6

with her. Doe shook her head and tried to say no but was unable to speak. Montana ignored her shaking her head and put his penis in her anus. Doe could not remember exactly how long Montana's penis was in her anus, "probably [] five minutes or so[,]" but it hurt. She wanted to cry but no tears would come.

Montana took his penis out of Doe's anus and reinserted it in her vagina. Doe again briefly blacked out and when she came to, Montana removed his penis from her vagina and began to perform oral sex on her. Doe still felt intoxicated. From the time that Montana started sodomizing her, Doe tried to yell but all she could do was make a low-pitched "wailing" sound. While Montana was performing oral sex on her, Doe again lost consciousness.

When Doe woke up again, Montana was again having vaginal intercourse with her. Doe was "a little bit more aware" this time and again felt her phone vibrating. Doe tried to reach for her phone, which was on the floor, but Montana pushed her back down on the bed and told her firmly not to answer it. Doe reached for and tried to answer her phone anyway. Montana took the phone from her hand and hung up. Doe again lost consciousness.

When Doe regained consciousness, Montana still had his penis in her vagina and Doe's phone was ringing. Montana told Doe not to answer it, saying "stay with [me]" in a desperate tone of voice. Doe answered the phone and spoke to A.K., who asked Doe where she was and if she was with anyone. Doe said she was with Montana and A.K. asked to speak to him. Doe did not feel that it was safe to tell A.K. what was happening to her. Doe held the phone toward Montana who paused and withdrew his penis but did not immediately take the phone, shaking his head rapidly and furrowing his brow.

Eventually, Montana took the phone from Doe and spoke to A.K. Doe could hear A.K. telling Montana "not to do anything to [Doe] because [she] ha[s] a boyfriend."

7

Montana replied that nothing had happened and Doe was sleeping. After a minute or so, Montana ended the call.

Doe lost consciousness around four or five times during Montana's sexual assault. At one point while Montana had his penis in her vagina, he asked Doe if she was on birth control and she shook her head no. Montana then asked if he could ejaculate inside her, but Doe did not respond. Montana repeated the question and Doe shook her head no. Doe could not remember whether Montana was wearing a condom at any time or if he ejaculated.

At one point during the assault, Doe tried to text "help" to her friend, N.,[6] but her first text read "H-K-E-O-O-S-B." Doe's second attempt read, "H-E-L-L-S-L-O-L-L-L-P," but on her third try, she succeeded in texting "Help." N. texted back asking if Doe was okay, but she did not respond and did not remember seeing that text. N. then called Doe and asked her if she was okay. Doe did not tell N. she was being raped because it "[d]idn't feel right to say that" while Montana was on top of her. Instead, she said "yeah," and asked what he was doing in an attempt to distract herself.

Doe also answered a call from her friend A.B. while Montana was having sex with her.[7] A.B. repeatedly asked Doe where she was. Doe said she was in a hotel room but did not know where. A.B. testified that Doe sounded confused and intoxicated. Doe asked Montana where they were but he replied he did not know either. A.B. got frustrated and asked to talk to Montana so Doe gave him her phone. Montana told A.B. that Doe was okay and that he was letting her sleep. Montana told A.B. he did not know the name of the hotel they were at. A.B. was worried and irritated and told Montana to

---

[6] N.'s last name does not appear in the record and he did not testify at trial.

[7] Doe's phone records showed "25 or more" unanswered calls that night from A.B. and other friends.

look in the room or go to the lobby in order to find out what hotel they were at. The call suddenly ended.

A.B. called back and Montana answered the phone. Montana told A.B. that Doe was vomiting.[8] A.B. told Montana to use Doe's phone to send her their location but Montana said he did not know how to do that on the type of phone that Doe had. A.B. said that she would walk Montana through the process and, as she began to do so, the call ended again.

When A.B. called again, Doe answered. Doe was able to share her location, so A.B. and three of Doe's other friends drove to the Fairmont from the De Anza Hotel. A.B. told Doe not to hang up but to get down to the lobby. Doe told Montana that her friends had arrived and she needed to go. Montana tried to convince Doe to stay.

Doe still felt intoxicated but managed to get dressed. Montana got dressed as well. Doe did not remember walking down the hallway or riding the elevator but remembered that Montana walked behind her as she exited the room. The next thing Doe remembered was exiting the elevator into the lobby and thinking that she needed to find her friends. A.B. described Doe as "disheveled" when she saw her in the lobby. Doe appeared to have trouble standing so A.B. went to help steady her.

Doe's friends walked her to their car and drove her back to the DeAnza Hotel. Doe did not tell them what had happened to her as she could not believe it herself. Doe also testified she did not remember much about the ride from the Fairmont to the DeAnza Hotel. After Doe got back to their room, some of her friends asked her what happened, but Doe did not tell them as she wanted to forget. Doe used the bathroom at the hotel but

---

[8] Doe testified that she threw up when she was in the hotel room, but could not recall if she did so before, during, or after the sexual assault. In his interview with police and again during his testimony at trial, Montana said he did not recall Doe vomiting in the hotel room.

9

she ended up sleeping on the couch at her dance team director's apartment. Doe vomited again as she was leaving the DeAnza Hotel.

When Doe awoke the next day (January 21), both her vagina and anus were sore. Doe drove back to her home that afternoon. She felt sick but no longer drunk. Doe texted A.K. about what Montana had done, writing in a series of texts " 'I didn't give consent. He kind of just started taking my clothes off and stuff and forced it[]' "; " 'Even if I were to have said yes, it still isn't consent if I'm drunk[]' "; " 'I don't even remember him taking me from the club[]' "; and " '[Montana] didn't want me to tell you guys where I was ….' " Doe texted N. that, because she could not remember how she got from the nightclub to the hotel or how Montana got her out of the nightclub without anyone noticing, she had been " 'low key kidnapped.' " In spite of her anxiety and fear of her boyfriend's reaction, Doe told him what happened. Doe and her boyfriend reported the assault to the police that day.

### c. Sexual assault examination

On the evening of January 21, Doe was examined by a sexual assault response team (SART) nurse. Doe told the nurse she had not changed clothes or showered since the sexual assault.[9] Doe had not defecated but had urinated and cleaned herself with toilet paper. Doe told the nurse that her " 'vagina[] hurts' " and her anus " 'felt weird.' " Doe reported that she had not been choked, hit, or grabbed during the assault which consisted of vaginal intercourse, anal intercourse, and Montana performing oral sex on her. The SART nurse noted that Doe told her Montana took her phone and told her not to tell anyone where she was.

---

[9] On cross-examination, the SART nurse testified that Doe told her she had vomited the night prior, but that Doe's clothing was "dry, intact, and clean." The SART nurse did not smell vomit on Doe's person during the examination.

10

The SART nurse examined Doe's body and saw several small abrasions and bruises. Doe had petechiae, which result from burst capillaries, on the back of her right arm, and the nurse said this could have been caused by someone grabbing Doe in that location. Doe had petechiae on the left side of her neck, which could have been caused by either pressure or suction.

In her examination of Doe's genitals, the SART nurse noted that Doe's perineum was swollen and tender, as Doe complained of pain when the nurse touched the area. The swelling and tenderness extended to Doe's labia majora, which was also visibly reddened. The SART nurse observed four lacerations to the opening of Doe's vagina, which were consistent with penetration.

Doe also complained of pain as the SART nurse examined her cervix, and the nurse observed that Doe's cervix was red and swollen. The SART nurse noted a laceration to Doe's perineum as well as lacerations consistent with anal penetration.

### d. Police investigation

On January 26, Doe got a phone call from Montana which she answered only because she did not recognize the number. When she answered, Montana identified himself and asked how she was. Doe told him to hold on, then ended the call. Montana called back around two minutes later, but Doe did not answer. Doe created a contact name for Montana's number that read "Don't pick up under any circumstance." Within an hour, Doe emailed a San Jose police officer with Montana's phone number and a summary of their brief conversation.

On February 3, Doe went to the San Jose Police Department and made a pretext call to Montana at the direction of Detective Jose Alfaro.[10] During the call, Montana denied having sex with Doe that night, saying that she "just wanted to sleep." On

_____

[10] A recording of the pretext call was played for the jury and admitted into evidence.

11

February 24, Doe returned to the police department and identified Montana in a photographic lineup.

On April 7, Alfaro interviewed Montana and, pursuant to a search warrant, took buccal swabs to collect DNA. A video recording of Montana's interview was played for the jury. In that interview, Montana first said he could not recall meeting anyone with Doe's name, but eventually said he met her and "her sister and her friend" at the nightclub. Montana said they were "having a good time" at the nightclub but then said that it was "really ridiculous" and "pretty shameful" that Doe would "abuse [] the police department for this issue." Montana repeatedly stated that Doe was an "adult." He said that Doe willingly went to the Fairmont Hotel with him after he repeatedly asked her if she was sure about that decision. In the hotel room, Montana said that Doe started undressing, they kissed, but they did not have sex. Montana felt that Doe did not want to do anything more and they were both tired, so he did not try to go further with her. Montana denied seeing Doe throw up when she was in the hotel room.

Montana said that he and Doe both slept. When Doe's friends called, he would answer but Doe would hang up on them. When Alfaro told Montana that Doe reported that they had sex, Montana denied it, saying, "Liar, she's a liar, she's a frickin' liar" and "that's fuckin' bullshit."

Montana's DNA was determined to be a contributor to the mixtures of DNA found on the waistband of Doe's underwear and her panty liner.

Dr. Mindy Mechanic, a clinical and forensic psychologist, testified as an expert in rape-related trauma and its effects on survivors of sexual assault, as well as counterintuitive victim behaviors. Dr. Mechanic did not know any of the facts involved in this case, did not know the victim or the defendant, and had not read the police report. In discussing "counterintuitive victim behavior," Dr. Mechanic explained that this was an "umbrella label" for the fact that victims will exhibit a "range of behaviors, actions,

12

responses, emotions, etc[.]" during or after a sexual assault and that those "might be surprising or not [] obvious to people … judging that person's behavior after the fact." As an example, Dr. Mechanic noted that, contrary to most expectations, victims of sexual assault will not physically resist, "particularly when the assailant is known in some way to the victim" as opposed to someone "jump[ing] out of the bushes" to attack them. This dynamic applies also to an assailant that the victim has "just encountered or met in a place that they feel relaxed or comfortable."

### 2. Defense case

#### a. Witnesses from the nightclub

M.C. testified that he met Montana and another friend, K.T., at the Temple nightclub in San Jose on the night of January 20. During the evening, Montana introduced Doe to M.C. In M.C.'s opinion, Doe's "body language and her eyes showed that she was attracted to" Montana. However, M.C. did not think that Doe appeared to be drunk when he first met her or later when she was dancing with Montana.

K.T. testified that Doe appeared to be having a good time with Montana, "smiling a lot, talking a lot, being social, sometimes kissing [Montana]." In his opinion, neither Doe nor Montana looked "too drunk" but both seemed to be "a little drunk."

At some point, Montana told M.C. that he was leaving the nightclub with Doe. M.C. saw Montana and Doe head toward an exit. According to M.C., Doe did not appear to be drunk and Montana was not holding her up as they walked. After reviewing video from the nightclub, M.C. admitted that he was not actually looking at Montana and Doe as they exited the nightclub and it did appear in the video that Doe was drunk as she was walking out.

Soon after Montana left the nightclub, M.C. sent him a text asking where he was and whether he was okay. Montana replied that he was at a hotel. Soon after, Montana texted M.C. that he had "hooked up" with Doe that night and she was "very nice."

13

L.A. testified he was with Doe and their other friends at the Temple nightclub on January 20.  L.A. personally had six or seven shots at a friend's house and an additional four or five shots at the De Anza Hotel before heading to the nightclub.  Over the course of the evening, L.A. estimated that he drank between 15 and 16 shots and was "pretty messed up."  L.A. said that the amount of alcohol he consumed affected his memory of what took place that night.

L.A. had previously seen Doe when she was "highly intoxicated."  Before he left the nightclub, L.A. saw that Doe was really drunk, slurring her words, and Montana was holding her to keep her on her feet.

After L.A. and his other friends returned to the De Anza Hotel, he realized that Doe had not come back.  L.A. managed to reach Doe on her cellphone but she was not answering his questions clearly and he could not understand what she was saying.  Doe's voice was quiet and her speech was slurred.  L.A. could hear a man's voice in the background, and L.A. ended up talking to the man.  L.A. asked the man the name of the hotel where he and Doe were at, but the man said he did not know it.  L.A. thought the man was being "uncooperative" and "a little dismissive" in that conversation.  L.A. and his friends were scared.

When L.A. and the others picked Doe up in the lobby of the Fairmont Hotel, Doe was able to walk unassisted though she looked tired and "sluggish."  Doe appeared to be less drunk than when L.A. last saw her at the nightclub.

### b. Expert testimony on effects of alcohol

Halla Weingarten testified as an expert in forensic toxicology and the effects of alcohol on the human body.  According to Weingarten, when people consume alcohol they "tend to take more risks" and "are less capable of self-assessment."  She explained that alcohol ingestion impacts fine motor skills (e.g., texting on a phone) before it impacts gross motor skills (e.g., walking or dancing).  In response to a hypothetical,

14

Weingarten opined that a person who went to a nightclub and normally would not have sex with someone they just met, might decide to do so if they ingest an "adequate" amount of alcohol. Weingarten opined that a person who weighed the same as Doe and drank two shots of alcohol between 9:30 p.m. and 10:00 p.m. and an additional four shots of alcohol between 10:30 p.m. and 11:30 p.m. would have a maximum blood-alcohol concentration of 0.18 percent at approximately 12:55 a.m.

Weingarten described "alcoholic blackout" as occurring when someone is awake and active, but the alcohol they have consumed impacted their ability to form memories during that time. In Weingarten's opinion, during such a blackout, a person could agree to have sex but just not remember having done so the following day. According to Weingarten, alcoholic blackouts are more likely to occur where a person's "alcohol ingestion is rapid." Weingarten acknowledged that she was not an expert in the field of human memory.

### c. Montana's testimony

Montana testified that he arranged to meet his friends M.C. and K.T. at the Temple nightclub on January 20. About 20 minutes after he arrived at the nightclub, Montana saw Doe near the bar. Doe smiled at Montana and he smiled back. Montana introduced himself and they started talking. Montana felt there was a "spark" between Doe and himself and he was attracted to her.

Montana admitted that he lied to Doe about his age that night because he did not "want to feel too old" and wanted to "fit in." After he bought a drink for Doe and the two friends who were at the bar with her, she invited him to dance. Montana thought that Doe "seemed sober."

As they danced together, Montana thought that Doe wanted to have sex with him because she was "grinding" against him and kissing him with a "very sexually charged

15

… energy." Montana did not have to help her keep her balance or hold her so he did not think she was drunk.

After they danced for a while, Montana and Doe sat on a couch. They were talking on the couch and Doe said that she and Montana should "go somewhere else." Montana replied that he might get a room at a hotel and asked if she wanted to come with him. Montana thought that Doe "seemed tipsy" but not drunk. Doe said yes and led the way to the exit. On the way, Montana stopped to make sure that Doe "really wanted to go to the hotel" with him. Doe did not express any reservations about going and it "[s]eem[ed] like she made up her mind" to go with him.

As they walked from the nightclub to the hotel, Montana did not notice that Doe was having any trouble walking. Montana held hands with Doe sometimes, but he did not need to guide her or hold her in any way.

They arrived at the hotel and Montana checked in a little before 1:00 a.m. After Montana checked in, he and Doe walked to the elevators and he did not need to help her in any way. When shown video of him and Doe in the lobby, Montana agreed that Doe stumbled on the way to the elevator and he helped her regain her balance. Montana thought that Doe might have stumbled because the flooring went from tile to carpet in that area and the tile may have been slick due to light rain that had fallen that day.

After they entered the room, Doe headed toward the bed as Montana put his jacket away. When he turned toward Doe, he saw her taking off her clothes, except for her panties. Montana joined her on the bed, took off his shirt, and they started kissing. They started touching each other's genitals and Doe helped Montana take off her panties. Montana asked Doe if she wanted him to orally copulate her and she agreed.

After a short time, Doe told Montana she wanted him "inside [] her." Montana put his penis in her vagina but soon became worried about not having a condom and asked Doe if she was on birth control. Montana then asked if Doe enjoyed anal sex, and she

16

replied that "she really likes it." Doe rolled over and got onto her hands and knees on the bed. Montana and Doe began having anal sex, and Doe even assisted Montana in putting his penis in her anus. Montana soon climaxed, withdrawing his penis and ejaculating on Doe's "butt or leg area." Montana got some tissue paper so he and Doe could clean themselves, then they cuddled on the bed. Montana fell asleep.

As he was dozing, Montana became aware that Doe's phone was vibrating "quite a lot." He heard her speaking on the phone sometimes as well over the next 30 minutes to an hour. Montana got up and sat near Doe while she spoke and heard her tell the person that she was fine. Doe ended the call, but her phone buzzed again and, after Doe answered, she said that her friend wanted to talk to Montana, so he took the phone.

Montana spoke to A.B. who was "very demanding," "asking about the hotel," "wanting to pick [Doe] up." Montana thought A.B. was "pushy" so he avoided answering her questions about where they were. Montana felt that he and Doe were having a good time and he did not want Doe to leave. Doe had already told A.B. that she was fine, but A.B. was "trying to just override" what Doe had told her. Montana was shocked when A.B. said that Doe had a boyfriend and Montana should not have sex with her. After he hung up, Montana asked Doe if she had a boyfriend, but she said she had just broken up with him.

Montana fell asleep again and woke up to find Doe "kind of panicking, [] rushing to get dressed." Doe told him her friends were in the lobby and he asked if she wanted him to go downstairs with her. Doe said she did, and Montana accompanied her because he felt he "had nothing to hide."

Montana testified that as soon Doe saw her friends in the lobby, she "immediately went limp" and needed her friends "to help carry her out." It seemed to Montana that Doe was acting more intoxicated than she was in order to help explain to her friends why

17

she went to a hotel with a man she just met.  After Doe left with her friends, Montana checked out of the hotel at 2:47 a.m.

A day or two later, Montana texted and called Doe, hoping that he could see her again.  Doe did not answer his texts or his calls.

In talking about the pretext call, Montana said that he was working on a "critical" task when Doe called and was surprised when Doe told him she did not remember what happened that night.  Montana got suspicious when Doe asked if they had sex.  Montana offered to talk to her after work and, out of panic and fear, he lied and told her they did not have sex.  Montana admitted that he also told Doe during the pretext call that he could not even talk to her because "the alcohol hit [her] so hard."

Montana admitted that he lied to Detective Alfaro in his recorded interview when he denied having sex with Doe.  Montana believed that, because he had denied it in the pretext call, he needed to be consistent or he would be arrested.  Montana told Detective Alfaro that Doe went to the hotel with him voluntarily and consented to everything.

## II.  DISCUSSION

### A. Request to discharge retained counsel

Montana argues that the trial court abused its discretion in denying his request to discharge his retained counsel, which was first made after the jury returned its verdict but prior to sentencing.  His request was based on a claim that, because his retained counsel had rendered ineffective assistance to him *before* trial, they had a conflict of interest in continuing to represent him for purposes of bringing a new trial motion. The Attorney General contends that the trial court acted within the scope of its discretion by concluding that Montana's request to discharge retained counsel was untimely as it would have caused a substantial delay in the proceedings.  We agree with the Attorney General and conclude the trial court did not abuse its discretion.

18

### *1. Additional background information*

Montana retained two attorneys, Javier Rios and Wesley Schroeder, to represent him from arraignment through sentencing. On February 14, 2020, approximately one week after the jury returned its verdict, Rios informed the trial court that Montana believed that both he and Schroeder had provided ineffective assistance of counsel. The trial court asked Montana if he wanted to discharge his retained counsel, but Montana replied that he did not "have enough information to answer that." Montana confirmed that he had discussed his concerns with his counsel.

Rios informed the court that he did not believe that there was a conflict of interest "at this time" but asked that the court refer the matter to the public defender's "office for special counsel" to investigate Montana's claims of ineffective assistance. The trial court asked Rios to provide authority, prior to the next hearing date, for the proposition that the court could appoint a public attorney to investigate the conduct of retained counsel.

The court then held an in-camera hearing on the matter, during which Montana raised three claims of ineffective assistance of counsel that he "definitely want[ed] to pursue." One, Montana said that his attorneys failed to advise him of his maximum sentencing exposure and he only became aware of that exposure after the jury issued its verdicts. According to Montana, his attorneys initially told him that he would get " '[s]ix years' " if he went to trial. Montana's counsel then advised him of a maximum 10-year exposure based on kidnapping allegations that were added after the preliminary hearing. When the prosecutor filed an amended information before trial which deleted those kidnapping allegations, Montana believed his maximum exposure reverted to six years. Montana said that if he was aware that his maximum exposure was more than six years, he would have accepted the deal offered by the prosecution before trial and pleaded to a misdemeanor.

19

Rios stated he did not remember telling Montana that his maximum exposure was six years. Rios surmised that Montana might be thinking of Rios informing him the midterm on a rape charge was six years. After the preliminary hearing and while the kidnapping allegations were still pending, Rios recalled telling Montana that if he lost at trial, he would " 'never get out.' " According to Rios, Montana did not care about this prospect because he was "adamant" that he wanted to go to trial and did not want to register as a sex offender.

Montana's second ineffective assistance claim was that counsel failed to advise him that the prosecutor could add charges based on evidence presented at the preliminary hearing. According to Montana, had he known this information, he would have waived the preliminary hearing entirely. Rios disputed Montana's statements that he was not advised that counts could be added following a preliminary examination.

Finally, Montana claimed that counsel had failed to adequately explain that the separate counts alleged in the information were separate offenses. In response, Rios stated that he was surprised by Montana's claim that he did not know more than one count had been charged in this case.

The trial court made no findings on Montana's ineffective assistance of counsel claims but set the matter for a hearing on his request to discharge retained counsel.

At the March 9, 2020 hearing on Montana's request, the trial court determined that allowing Montana to discharge retained counsel would result in "a substantial disruption of the orderly processes of justice." The court noted that the case involved extensive discovery which included hours of video evidence that had to be reviewed in preparing for trial. The trial itself lasted 19 days, with 10 days of witness testimony. The court estimated that it would require an attorney to spend anywhere from six months to a year to review the record in order to determine whether there were grounds to bring a new trial

motion and to be prepared for sentencing.  Retained counsel and an attorney from the public defender's office stated that the court's one year time estimate was more realistic.

The trial court set Montana's sentencing for April 10, 2020, but because of the COVID-19 pandemic, sentencing did not take place until August 11, 2021.[11]

### 2. Legal principles and standard of review

A criminal defendant has the right to discharge retained counsel and should ordinarily be permitted to do so.  (*People v. Ortiz* (1990) 51 Cal.3d 975, 981.)  A defendant need not show the attorney has performed incompetently, as would be required to discharge appointed counsel.  (*People v. Lara* (2001) 86 Cal.App.4th 139.)  " 'The right to discharge retained counsel is not absolute, however . ...' [Citation.]  The court must 'balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.' [Citation.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1411 (*Dowdell*).  " 'A criminal defendant's right to decide how to defend himself [or herself] should be respected unless it will result in "significant prejudice" to the defendant or in a "disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." ' [Citation.]" (*Ibid.*)  Whereas the erroneous

---

[11] On our own motion, this court takes judicial notice of the COVID-19 pandemic that was occurring during this time period (Evid. Code, §§ 452, subd. (h), 459, subd. (a)) and the executive and judicial orders issued in response thereto (Evid. Code, §§ 452, subd. (c), 459, subd. (a)).  "On March 4, 2020, Governor Gavin Newsom declared a state of emergency as a result of the spread of the COVID-19 virus.  (*In re M.P.* (2020) 52 Cal.App.5th 1013, 1016 [267 Cal. Rptr. 3d 106] (*In re M.P.*).)  On March 19, 2020, Governor Newsom issued an executive order directing all Californians not providing essential services to stay at home.  (*Ibid.*)  This order did not close the courts, which were considered an essential service.  (*Ibid.*)  [¶] On March 23, 2020, former Chief Justice Tani G. Cantil-Sakauye issued a statewide order, pursuant to her authority under the California Constitution, article VI, section 6, and Government Code section 68115, authorizing superior courts to adopt proposed rules or rule amendments to address the impact of the COVID-19 pandemic to take effect immediately, without advance circulation for 45 days of public comment.  (*Ibid.*)" (*Barron v. Santa Clara County Valley Transportation Authority* (2023) 97 Cal.App.5th 1115, 1122–1123.)

denial of a motion to *substitute* counsel is structural error, "we apply an abuse of discretion standard of review to a trial court's denial of a motion to relieve retained counsel. [Citations.]" (*Ibid*., fn. omitted.)

### 3. Analysis

Montana has failed to show that the trial court abused its discretion in denying his motion to discharge retained counsel on the ground that it would result in "a substantial disruption of the orderly processes of justice." In considering whether to file a motion for a new trial, a newly appointed attorney would first have to confront a significant amount of evidence and transcripts from a 19-day trial, with 10 days of witness testimony (including several expert witnesses), hearings on motions in limine, as well as jury voir dire. After the court estimated that such a task would require anywhere from six months to a year, both retained counsel and an attorney from the public defender's office indicated that the trial court's estimation of one year was more realistic than six months.

Contrary to Montana's assertion that the trial court relied on " '[b]lanket generalizations' " about delay, the record shows that the court carefully considered the complex time-consuming task that awaited any attorney that would take over for retained counsel. Furthermore, we are not persuaded by Montana's suggestion that the 17-month delay in his sentencing (from April 2020 to August 2021) demonstrates that discharging his retained counsel would not have disrupted the orderly processes of justice. This argument overlooks the fact that Montana's sentencing delay was caused by an unforeseeable pandemic, not by any action taken by the court or the parties.

Under the circumstances of this case, we conclude the trial court did not abuse its discretion in denying Montana's motion to discharge retained counsel.

### B. Ineffective assistance of counsel

Montana next argues that, because his retained counsel had provided ineffective representation, they had a disqualifying conflict of interest and the trial court erred by

permitting retained counsel to continue their representation.  In addition, retained counsel was ineffective for failing to file a motion for a new trial due to that conflict of interest. We disagree.

### 1. Legal principles and standard of review related to conflict of interest

The standard for evaluating claims that counsel provided constitutionally ineffective assistance is set forth in *Strickland v. Washington* (1984) 466 U.S. 668, 687–694, which states: "[t]o secure reversal . . . upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003.)  "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.  All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

"In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest '*that affected counsel's performance*—as opposed to a mere theoretical division of loyalties.' [Citations.]  '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.' [Citation.]  'An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' [Citation.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 417–418 (*Doolin*).) "Although the trial court is required to perform some inquiry once it knows or reasonably

should know of a particular conflict of interest, the court may decline to pursue the matter if, in its view, the potential for conflict is too slight." (*People v. Cornwell* (2005) 37 Cal.4th 50, 75 (*Cornwell*), disapproved on another ground in *Doolin*, *supra*, 45 Cal.4th at p. 421, fn. 22.)

Additionally, where a defendant argues that a conflict of interest caused an attorney not to do something, such as file a motion for new trial, a reviewing court must " 'examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' [Citation.]" (*Doolin*, *supra*, 45 Cal.4th at p. 418.)

### 2. Analysis

In this case, Montana's claims of ineffective assistance were based on his claims that retained counsel failed to adequately advise him about the number of charges he was facing and the maximum possible exposure he faced were he convicted following a trial. All of these events and communications took place outside the court's purview and in private consultations between Montana and his counsel. While there was some discussion of the factual bases for Montana's claims of ineffective assistance of counsel during the hearing on his request to discharge retained counsel, the evidence (e.g., sworn declarations) that might support Montana's claims was not within the record for the trial court to consider. Therefore, Montana's contentions may be "more appropriately resolved in a habeas corpus proceeding." (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

In addition, the trial court conducted a sufficient inquiry into the potential conflict of interest claim by allowing Montana to explain the reasons why he believed retained counsel had provided ineffective assistance and giving retained counsel an opportunity to respond to those claims. (*Cornwell*, *supra*, 37 Cal.4th at p. 75.) In *Cornwell*, the trial court declined to address the defendant's ineffective assistance of counsel claim given the

24

substantial delay that would occur by having substitute counsel review the record and evaluate the merits of filing a new trial motion. (*Id*. at p. 101.) The California Supreme Court approved the trial court's decision because "in the present case the claim of ineffective assistance of counsel … rested primarily upon matters other than what the trial court could have observed during trial, and the court acted within its discretion in concluding the claim should be litigated in a habeas corpus proceeding." (*Ibid*.) That is certainly the case here. Montana's claims of ineffective assistance were based on events which occurred entirely outside the court's observation and are thus appropriately addressed by way of a petition for writ of habeas corpus.

As a result, we conclude that the trial court did not abuse its discretion in declining to decide Montana's ineffective assistance of counsel claims.

### *3. Additional background related to request for new trial*

On the day of his sentencing hearing, Montana filed a handwritten letter raising five additional claims of ineffective assistance of counsel that he had not raised at the February 14, 2020, in-camera hearing.[12]

First, Montana asserts that retained counsel failed to impeach Doe at trial with her testimony from the preliminary hearing, specifically her description of her physical position while Montana was sodomizing her. During the preliminary hearing, Montana argues that Doe demonstrated that he was behind her but, at trial, she testified she was lying on her back.

In his second claim, Montana asserts that trial counsel unreasonably failed to seek a mistrial after the investigating officer, Detective Alfaro, allegedly had an inappropriate

---

[12] The prosecutor reviewed this letter for the first time at the sentencing hearing, and informed the court that, while he did not object to including it in the record, he did not "stipulate to the accuracy of [Montana's] handwritten letter[,]" did not "stipulate that [he] witnessed what [Montana] appears to indicate [he] witnessed[,]" and indicated that, "in some instances," he did not know what events Montana was referencing in his letter.

conversation with a bailiff, in front of three jurors, in which he stated that he "got everything" on Montana.[13]

### 4. Analysis

Montana's additional claims of error do not show that retained counsel's failure to bring a new trial motion constituted ineffective assistance of counsel arising from their purported conflict of interest.

First, Doe's testimony from the preliminary examination is entirely in accord with her testimony at trial. At the preliminary examination, the prosecutor asked Doe if she was "still lying down on the bed" when Montana put his penis in her anus and she replied, "Yes." The prosecutor then asked if Doe was "[s]till on your back or in a different position," and Doe confirmed, "[s]till on my back." While Montana contends that Doe made some sort of physical demonstration that Montana was behind her at the time, there is nothing in the transcript of the preliminary examination to support this. A reasonable attorney would not seek to impeach a witness's testimony on this record nor would the failure to do so support a motion for new trial.

Similarly, nothing in the record supports Montana's assertion that Detective Alfaro made any remarks about the case to a bailiff, in front of several jurors, while court was not in session. Montana's letter does not indicate that his counsel overheard these remarks or, if Montana was the one who overheard them, that he informed his counsel about it. Without some indication that retained counsel knew of this (alleged) improper communication by Detective Alfaro, we cannot say that the failure to raise this during or

---

[13] Montana's briefing on appeal does not address the three additional points he made in the handwritten letter and we consider those points to be forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B).)

26

after trial demonstrated ineffective assistance. "Counsel is not ineffective for failing to make frivolous or futile motions." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

As a result, we conclude that Montana's unsupported claims do not establish his retained counsel was ineffective for failing to bring a new trial motion.

### C. Evidentiary error

Montana next argues that the trial court abused its discretion when it excluded testimony, pursuant to Evidence Code section 352, from L.A. as to whether he believed Doe was capable of consenting to sexual intercourse. We disagree.

#### 1. Additional background

The defense called L.A. as a witness. The defense asked L.A. to describe Doe when he saw her in the hotel lobby, after the sexual assault. Defense counsel then asked if L.A. remembered whether the police later "asked about whether you had an opinion about whether she could say 'yes' or 'no' to sex?" The prosecutor objected and, after the court excused the jurors, the parties discussed the matter. The prosecutor noted that, at the time in question, the sexual assault had already occurred, so L.A. could only speculate as to Doe's ability to consent in the past. In addition, the prosecutor objected that the question called for a legal conclusion about Doe's state of mind and also called for an expert opinion from a lay witness. Defense counsel responded that L.A. testified he had previously seen Doe "nine out of ten" on a ten-point scale of intoxication. Defense counsel also said that it was "not a technical kind of issue" and they were not asking L.A. to "decide … the exact jury instruction description of what constitutes consent." The court excluded the evidence, saying L.A. only observed Doe "significantly later than when she left the bar" and L.A.'s opinion was "irrelevant as to whether she could consent to sex when she came out of the elevator." The court also noted that "under [Evidence Code section] 352, I think the probative value is minimal, if any, and I think it would be prejudicial and mislead the jury."

27

### 2. Legal principles and standard of review

" ' "A lay witness may express an opinion based on his or her perception, but only where helpful to a clear understanding of the witness's testimony (Evid. Code, § 800, subd. (b)), 'i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed.' [Citation.]" … A lay witness generally may not give an opinion about another person's state of mind, but may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. Sanchez* (2016) 63 Cal.4th 411, 456 (*Sanchez*).)

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.) We review the admission of lay opinion testimony for abuse of discretion. (*Sanchez*, *supra*, 63 Cal.4th at p. 456.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) A trial court has broad discretion in determining whether to admit or exclude evidence under this section (*People v. Ramos* (1997) 15 Cal.4th 1133, 1170), and a court's rulings under Evidence Code section 352 will not be overturned absent an abuse of that discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

### 3. Analysis

In this case, the trial court properly excluded L.A.'s opinion testimony regarding Doe's ability to consent to sex. First, as the trial court noted, L.A.'s observed Doe in the hotel well after the sexual assault occurred. Approximately two hours passed between

28

Doe and Montana arriving at the hotel and Doe leaving with L.A. and her other friends. Montana testified that he and Doe engaged in intercourse soon after entering the hotel room and then they both slept for some time. Any opinion L.A. had of Doe's ability to consent *at the time* he saw her in the lobby was irrelevant.

Second, the question of whether Doe was capable of consenting to intercourse when she was in the hotel was a matter for the jury to decide and L.A.'s opinion on that ultimate question would be improper. The jury could readily draw its own inferences as to Doe's ability to consent from L.A.'s description of her at the hotel and his prior observations of her when she was drunk. In addition, the limited value of L.A.'s opinion on this issue would be far outweighed by the "undue consumption of time" (Evid. Code, § 352) that would ensue in investigating and testing its basis. Consequently, the trial court did not abuse its discretion in finding that L.A.'s lay opinion testimony should be excluded under Evidence Code section 352.

### 4. No prejudice

Even assuming the trial court abused its discretion in excluding L.A.'s lay opinion testimony, Montana cannot show that he was prejudiced thereby. Error in admitting or excluding evidence at the guilt phase of a trial is reviewed under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 837.[14] Under *Watson*, we ask whether there is a reasonable chance—more than an abstract possibility but not necessarily " 'more likely than not' "—that a result more favorable to defendant would have been reached absent the assumed error. (*People v. Vasquez* (2017) 14 Cal.App.5th 1019, 1041.)

---

[14] Montana also argues that exclusion of L.A.'s opinion testimony violated his due process rights and that the error is therefore subject to review under the stricter standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, pursuant to which the burden is on the Attorney General to show the error was harmless beyond a reasonable doubt. We disagree that the exclusion of this evidence violated Montana's due process rights or deprived him of his right to a fair trial.

Montana points to the evidence from the nightclub that suggested Doe was interested in having sex with him, e.g., her "grinding" with him on the dance floor, her French kissing him, and her putting her hand near the top of his buttocks, and argues that L.A.'s testimony as to Doe's ability to consent to sex could reasonably have convinced a jury to acquit him. Montana overlooks the fact that the jury saw and heard the evidence of Doe's conduct at the nightclub, in conjunction with her testimony about her inability to recall what happened after she left the nightclub and ultimately concluded that Doe was not capable of consenting. We conclude that, even had the trial court admitted L.A.'s opinion testimony, it was not reasonably probable that the jury would have returned a more favorable result.

## III. DISPOSITION

The judgment is affirmed.

_____
WILSON, J.

WE CONCUR:

_____
GREENWOOD, P. J.

_____
BROMBERG, J.

H049456
*The People v. Montana*